UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

UNITED STATES OF AMERICA,

                Plaintiff,

v.

D-3 NEAL CRAMER,

                Defendant.

Case No. 4:19-cr-20437

Hon. Matthew F. Leitman
United States District Judge

### United States' Response Opposing
### the Defendant's Motion for Compassionate Release

Neal Cramer pleaded guilty to conspiracy to distribute more than 500 grams
of methamphetamine, an offense punishable by at least ten years and up to life
imprisonment. In the Rule 11 agreement, he admitted that he could have foreseen
that the conspiracy would involve 1.5 to 4.5 kilograms of pure methamphetamine.
(ECF No. 40, PageID. 134.) At the sentencing hearing in early March of 2020, the
government moved for a departure, which the court granted. The court then
imposed a sentence of 18 months which was a dramatic variance from the
guideline range and from the government's requested departure. (ECF No. 47,
PageID. 188.) At the sentencing, the court noted that Cramer did not have to report
to the Bureau of Prisons (BOP) until at least July 1, 2020, because of concerns
related to Covid-19.

Cramer did not report to BOP in July. Instead, in June of 2020, he asked the government to adjourn his report date until August again because of the Covid-19 pandemic. The government concurred and would have concurred with additional adjournments. Cramer reported on August 3, 2020. A week later, on August 10, 2020, he requested compassionate release from the BOP, which BOP denied. He now moves for compassionate release under 18 U.S.C. § 3582(c)(1)(A). His motion should be denied.

Cramer does not qualify for compassionate release. Although Cramer's heightened risk from Covid-19 based on his diagnosis of COPD qualifies as an "extraordinary and compelling reason[]" for release under § 1B1.13(1)(A) & cmt. n.1(A), Cramer is not otherwise eligible for release. Cramer's offense and criminal history make him a danger to the community, which precludes release under USSG § 1B1.13(2). And the § 3553(a) factors—which the Court must also consider under § 3582(c)(1)(A)—likewise do not support release.

The Bureau of Prisons has also taken significant steps to protect all inmates, including Cramer, from Covid-19. Since January 2020, the Bureau of Prisons has implemented "a phased approach nationwide," implementing an increasingly strict protocol to minimize the virus's spread in its facilities. *Wilson v. Williams*, 961 F.3d 829, 833–34 (6th Cir. 2020). And the Bureau of Prisons has assessed its entire population to determine which inmates face the most risk from Covid-19, pose the

least danger to public safety, and can safely be granted home confinement. As of November 18, 2020, this process has already resulted in at least 17,332 inmates being placed on home confinement. *See* BOP Covid-19 Website. Especially given the Bureau of Prisons' efforts—and "the legitimate concerns about public safety" from releasing inmates who might "return to their criminal activities," *Wilson*, 961 F.3d at 845—the Court should deny Cramer's motion for compassionate release.

## Background

In the Spring of 2019, Neal Cramer worked for and with Michael Johnson, a methamphetamine dealer. Cramer distributed methamphetamine to Mr. Johnson's customers, and stored large quantities of Mr. Johnson's methamphetamine at his home in Flint. In June 2019, police executed a search warrant at Cramer's home and found over a kilogram of methamphetamine and 27 marijuana plants.

Cramer was charged in federal court and pleaded guilty. He was sentenced to 18 months imprisonment. He began serving his prison sentence on August 3, 2020, and is currently incarcerated at FCI Morgantown. As of November 18, 2020, FCI Morgantown has two staff member who are positive for Covid-19, but no inmates who are positive for Covid-19, no inmates or staff who have died from Covid-19, and five inmates and four staff members that have recovered from Covid-19. BOP Coronavirus.

Cramer is 37 years old, and his projected release date is November 12, 2021. He

is healthy (PSR ¶¶ 43-45), but has medical records showing a history of COPD.

Cramer has moved for compassionate release.

## Argument

**I.      The Bureau of Prisons has responded to Covid-19 by protecting inmates and increasing home confinement.**

**A.      The Bureau of Prisons' precautions have mitigated the risk from Covid-19 within its facilities.**

The Bureau of Prisons has reacted quickly to confront Covid-19's spread within

its facilities. *Wilson v. Williams*, 961 F.3d 829, 833–34 (6th Cir. 2020). For over

almost a decade, the Bureau of Prisons has maintained a detailed protocol for

responding to a pandemic. Consistent with that protocol, the Bureau of Prisons

began planning for Covid-19 in January 2020. *Wilson*, 961 F.3d at 833–34.

On March 13, 2020, the Bureau of Prisons started modifying its operations to

implement its Covid-19 Action Plan and minimize the risk of Covid-19

transmission into and inside its facilities. *Id.*; *see* BOP Covid-19 Modified

Operations Website. Since then, as the worldwide crisis has evolved, the Bureau of

Prisons has repeatedly revised its plan. *Wilson*, 961 F.3d at 834. To stop the spread

of the disease, the Bureau of Prisons has restricted inmate movement within and

between facilities. *Id.* When new inmates arrive, asymptomatic inmates are placed

in quarantine for a minimum of 14 days. *Id.* Symptomatic inmates are provided

with medical evaluation and treatment and are isolated from other inmates until testing negative for Covid-19 or being cleared by medical staff under the CDC's criteria. *Id.*

Within its facilities, the Bureau of Prisons has "modified operations to maximize physical distancing, including staggering meal and recreation times, instating grab-and-go meals, and establishing quarantine and isolation procedures." *Id.* Staff and inmates are issued face masks to wear in public areas. *See* BOP FAQs: Correcting Myths and Misinformation. Staff and contractors are screened for symptoms, and contractors are only permitted to access a facility at all if performing essential service. *Wilson*, 961 F.3d at 834. Social visits have been suspended to limit the number of people entering the facility and interacting with inmates. *Id.* But to ensure that relationships and communication are maintained throughout this disruption, the Bureau of Prisons has increased inmates' telephone allowance to 500 minutes per month. Legal visits are permitted on a case-by-case basis after the attorney has been screened for infection.

Like all other institutions, penal and otherwise, the Bureau of Prisons has not been able to eliminate the risks from Covid-19 completely, despite its best efforts. But the Bureau of Prisons' measures will help federal inmates remain protected from Covid-19 and ensure that they receive any required medical care during these difficult times.

5

### B. The Bureau of Prisons is increasing the number of inmates who are granted home confinement.

The Bureau of Prisons has also responded to Covid-19 by increasing the placement of federal prisoners in home confinement. Recent legislation now temporarily permits the Bureau of Prisons to "lengthen the maximum amount of time for which [it] is authorized to place a prisoner in home confinement" during the Covid-19 pandemic. Coronavirus Aid, Relief, and Economic Security Act (CARES Act) § 12003(b)(2), Pub. L. No. 116-136, 134 Stat. 281, 516 (Mar. 27, 2020). The Attorney General has also issued two directives, ordering the Bureau of Prisons to use the "various statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing Covid-19 pandemic." (03-26-2020 Directive to BOP, at 1; *accord* 04-03-2020 Directive to BOP, at 1). The directives require the Bureau of Prisons to identify the inmates most at risk from Covid-19 and "to consider the totality of circumstances for each individual inmate" in deciding whether home confinement is appropriate. (03-26-2020 Directive to BOP, at 1).

The Bureau of Prisons' efforts on this point are not hypothetical. Over 17,332 federal inmates have been granted home confinement since the Covid-19 pandemic began, and that number continues to grow. BOP Coronavirus FAQs. As the Sixth Circuit recently stressed, these efforts show that "[t]he system is working as it

6

should": "A policy problem appeared, and policy solutions emerged." *United States v. Alam*, 960 F.3d 831, 836 (6th Cir. 2020).

This policy solution is also tailored to the realities of the Covid-19 pandemic. As the Attorney General's directives have explained, the Bureau of Prisons is basing its home-confinement decisions on several factors:

> 1.) Each inmate's age and vulnerability to Covid-19;
>
> 2.) Whether home confinement would increase or decrease the inmate's risk of contracting Covid-19; and
>
> 3.) Whether the inmate's release into home confinement would risk public safety.

(03-26-2020 Directive to BOP; 04-03-2020 Directive to BOP). These criteria account for justifiable concerns about whether inmates "might have no safe place to go upon release and [might] return to their criminal activities," as well as "legitimate concerns about public safety." *Wilson*, 961 F.3d at 845.

The Bureau of Prisons, after all, cannot open its facilities' gates indiscriminately and unleash tens of thousands of convicted criminals, en masse. *See id.* It must focus on the inmates who have the highest risk factors for Covid-19 and are least likely to engage in new criminal activity. This is true not just to protect the public generally, but to avoid the risk that a released defendant will bring Covid-19 back into the jail or prison system if he violates his terms of release

7

or is caught committing a new crime. *See* 18 U.S.C. § 3624(g)(5); 34 U.S.C. § 60541(g)(2).

The Bureau of Prisons must also balance another important consideration: how likely is an inmate to abide by the CDC's social-distancing protocols or other Covid-19-based restrictions on release? Many inmates—particularly those who have been convicted of serious offenses or have a lengthy criminal record—been already proven unwilling to abide by society's most basic norms. It is thus important to evaluate "how . . . released inmates would look after themselves," *Wilson*, 961 F.3d at 845, including whether a particular inmate would adhere to release conditions and social-distancing protocols during the pandemic. If a prisoner would be unlikely to take release conditions or Covid-19 precautions seriously, for instance, he would also be far more likely than the general public to contract and spread Covid-19 if released.

Finally, the Bureau of Prisons' home-confinement initiative allows it to marshal and prioritize its limited resources for the inmates and circumstances that are most urgent. For any inmate who is a candidate for home confinement, the Bureau of Prisons must first ensure that his proposed home-confinement location is suitable for release, does not place him at an even greater risk of contracting Covid-19, and does not place members of the public at risk from him. It must assess components of the release plan, including whether the inmate will have access to health care

and other resources. It must consider myriad other factors, including the limited availability of transportation right now and the probation department's reduced ability to supervise inmates who have been released. All of those decisions require channeling resources to the inmates who are the best candidates for release.

Those types of system-wide resource-allocation decisions are difficult even in normal circumstances. That is why Congress tasked the Bureau of Prisons to make them and has not subjected the decisions to judicial review. 18 U.S.C. § 3621(b) ("Notwithstanding any other provision of law, a designation of a place of imprisonment under this subsection is not reviewable by any court."); *United States v. Patino*, No. 18- 20451, 2020 WL 1676766, at \*6 (E.D. Mich. Apr. 6, 2020) ("[A]s a general rule, the Court lacks authority to direct the operations of the Bureau of Prisons."). It is especially true now, given the Bureau of Prisons' substantial and ongoing efforts to address the Covid-19 pandemic.

## II.     The Court should deny Cramer's motion for compassionate release.

Cramer's motion for a reduced sentence should be denied. A district court has "no inherent authority . . . to modify an otherwise valid sentence." *United States v. Washington*, 584 F.3d 693, 700 (6th Cir. 2009). Rather, a district court's authority to modify a defendant's sentence is "narrowly circumscribed." *United States v. Houston*, 529 F.3d 743, 753 n.2 (6th Cir. 2008). Absent a specific statutory exception, a district court "may not modify a term of imprisonment once it has

been imposed." 18 U.S.C. § 3582(c). Those statutory exceptions are narrow.

*United States v. Ross*, 245 F.3d 577, 586 (6th Cir. 2001). Compassionate release

under 18 U.S.C. § 3582(c)(1)(A) is equally narrow.

*First*, compassionate release requires exhaustion. If a defendant moves for

compassionate release, the district court may not act on the motion unless the

defendant files it "after" either completing the administrative process within the

Bureau of Prisons or waiting 30 days from when the warden at his facility received

his request. 18 U.S.C. § 3582(c)(1)(A); *United States v. Alam*, 960 F.3d 831, 832

(6th Cir. 2020). And as the Sixth Circuit recently held, this statutory exhaustion

requirement is mandatory. *Alam*, 960 F.3d at 832–36. In this case, the government

does not contest that Cramer has exhausted his administrative remedies.

*Second*, even if a defendant exhausts, he must show "extraordinary and

compelling reasons" for compassionate release, and release must be "consistent

with" the Sentencing Commission's policy statements. 18 U.S.C. § 3582(c)(1)(A).

As with the identical language in § 3582(c)(2), compliance with the policy

statements incorporated by § 3582(c)(1)(A) is mandatory. *See Dillon v. United*

*States*, 560 U.S. 817 (2010); *United States v. Jackson*, 751 F.3d 707, 711 (6th Cir.

2014). To qualify, a defendant must have a medical condition, age-related issue,

family circumstance, or other reason that satisfies the criteria in USSG

§ 1B1.13(1)(A) & cmt. n.1, and he must "not [be] a danger to the safety of any

10

other person or to the community," USSG § 1B1.13(2). While the government

does not contest that Cramer's past diagnosis of COPD is an extraordinary and

compelling reason for release, the Court should not release Cramer because he

would be a "danger to the safety of the community."

*Third*, even if a defendant is eligible for compassionate release, a district court

may not grant the motion unless the factors in 18 U.S.C. § 3553(a) support release.

18 U.S.C. § 3582(c)(1)(A); USSG § 1B1.13. As at sentencing, those factors require

the district court to consider the defendant's history and characteristics, the

seriousness of the offense, general and specific deterrence, and the need to avoid

unwarranted disparities. 18 U.S.C. § 3553(a).

### A.     Cramer is not eligible for compassionate release under the mandatory criteria in USSG § 1B1.13.

Congress tasked the Sentencing Commission with "describ[ing] what should be

considered extraordinary and compelling reasons for [a] sentence reduction" under

§ 3582(c)(1)(A), as well as developing "the criteria to be applied and a list of

specific examples" for when release is permitted. 28 U.S.C. § 994(t). The

compassionate-release statute thus permits a sentence reduction only when

"consistent with" the Sentencing Commission's policy statements. 18 U.S.C. §

3582(c)(1)(A).

Because the Sentencing Commission fulfilled Congress's directive in USSG

§ 1B1.13, compliance with that policy statement is mandatory for any defendant

11

seeking compassionate release under § 3582(c)(1)(A). The Supreme Court has already reached the same conclusion for compliance with USSG § 1B1.10 under 18 U.S.C. § 3582(c)(2), based on the statutory language there. *Dillon v. United States*, 560 U.S. 817, 827 (2010). And the statutory language in § 3582(c)(1)(A) is identical to the language in § 3582(c)(2). *Compare* § 3582(c)(1)(A) (requiring that "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission"), *with* § 3582(c)(2) (same). When Congress uses the same language in the same statute, it must be interpreted in the same way. *United States v. Marshall*, 954 F.3d 823, 830 (6th Cir. 2020). In both contexts, then, the Sentencing Commission's restraints "on a district court's sentence-reduction authority [are] absolute." *United States v. Jackson*, 751 F.3d 707, 711 (6th Cir. 2014) (citing *Dillon*, 560 U.S. 817); *accord United States v. Saldana*, 807 F. App'x 816, 819–20 (10th Cir. 2020).

The First Step Act did not change that. It amended only *who* could move for compassionate release under § 3582(c)(1)(A). It did not amend the substantive requirements for release. *Saldana*, 807 F. App'x at 819–20. Section 1B1.13 remains binding. Section 1B1.13 existed prior to the First Step Act. Yet Congress chose not to alter the directive in 18 U.S.C. § 3582(c)(1)(A) that release must be consistent with the Sentencing Commission's policy statements.

12

Section 1B1.13 cabins compassionate release to a narrow group of non-dangerous defendants who are most in need. That policy statement limits "extraordinary and compelling reasons" to four categories: (1) the inmate's medical condition; (2) the inmate's age; (3) the inmate's family circumstances; and (4) other reasons "[a]s determined by the Director of the Bureau of Prisons," which the Bureau of Prisons has set forth in Program Statement 5050.50. USSG § 1B1.13 cmt. n.1.

The Covid-19 pandemic does not, by itself, qualify as the type of inmate-specific condition permitting compassionate release. The Bureau of Prisons has worked diligently to implement precautionary measures reducing the risk from Covid-19 to Cramer and other inmates. *See Wilson v. Williams*, 961 F.3d 829, 833–34 (6th Cir. 2020). Thus, "the mere existence of Covid-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread." *Raia*, 954 F.3d at 597; *cf. Wilson*, 961 F.3d at 845.

Cramer's medical records, however, establish that he has been diagnosed with COPD, which the CDC has confirmed is a risk factor that places a person at increased risk of severe illness from Covid-19. *See* CDC Risk Factors (as updated). Given the heightened risk that Covid-19 poses to someone with COPD, the

13

government does not contest that Cramer has satisfied the first eligibility threshold for compassionate release during the pandemic. *See* USSG § 1B1.13(1)(A) & cmt. n.1(A).

But Cramer remains ineligible for compassionate release because he is a danger to the community. Section 1B1.13(2) only permits release if a "defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." As with the other requirements in § 1B1.13, this prohibition on releasing dangerous defendants applies to *anyone* seeking compassionate release. 18 U.S.C. § 3582(c)(1)(A) (requiring that release be "consistent with" § 1B1.13); *United States v. Kincaid*, 802 F. App'x 187, 188 (6th Cir. 2020) (confirming that a released defendant must "not represent a danger to the safety of any other person or the community"). Although a court must also evaluate the defendant's dangerousness when balancing the § 3553(a) factors, dangerousness alone is a per se bar to release under USSG § 1B1.13(2). *United States v. Knight*, No. 15-20283, 2020 WL 3055987, at *3 (E.D. Mich. June 9, 2020); *United States v. Oliver*, No. 2:17-cr-20489, 2020 WL 2768852, at *7 (E.D. Mich. May 28, 2020).

An evaluation of dangerousness under § 3142(g)—which § 1B1.13(2) references for its dangerousness determination—requires a comprehensive view of community safety, "a broader construction than the mere danger of physical violence." *United States v. Cook*, 880 F.2d 1158, 1161 (10th Cir. 1989) (per

14

curiam). Indeed, even when considering *pretrial* detention under § 3142(g), "[t]he concept of a defendant's dangerousness encompasses more than merely the danger of harm involving physical violence." *United States v. Williams*, No. 20-1413, 2020 WL 4000854, at *1 (6th Cir. July 15, 2020) (citing *United States v. Vance*, 851 F.2d 166, 169–70 (6th Cir. 1988)). That reasoning applies even more strongly post-judgment, when the defendant's presumption of innocence has been displaced by a guilty plea or jury's verdict and when "the principle of finality" becomes "essential to the operation of our criminal justice system." *Teague v. Lane*, 489 U.S. 288, 309 (1989).

Section 1B1.13(2) is thus a significant hurdle to release. It bars the release of violent offenders. It bars the release of most drug dealers, "even without any indication that the defendant has engaged in violence." *United States v. Stone*, 608 F.3d 939, 947–48 & n.6 (6th Cir. 2010) ("[D]rug trafficking is a serious offense that, in itself, poses a danger to the community."); *Knight*, 2020 WL 3055987, at *3. It bars the release of defendants whose offenses involved minor victims or child pornography. *See United States v. McGowan*, No. 20-1617, 2020 WL 3867515, at *3 (6th Cir. July 8, 2020). It also bars the release of many "non-violent" offenders, such as defendants who were involved in serial or significant fraud schemes or otherwise present a danger to the community in some respect.

15

Adhering to § 1B1.13(2) is especially important given the current strain on society's first responders and the rise in certain types of crime during the Covid-19 pandemic. Police departments in many cities have been stretched to their limits as officers have either contracted Covid-19 or been placed in quarantine. Social services including drug treatment are stretched. Drug overdoses have skyrocketed. There are real risks to public safety right now, and those risks will only increase if our community is faced with a sudden influx of convicted defendants.

Cramer has a lengthy history of drug abuse and dependence, which led him to become involved in an incredibly dangerous offense. Because Cramer's release would endanger the community, § 1B1.13(2) prohibits reducing his sentence under § 3582(c)(1)(A).

### C.   The factors in 18 U.S.C. § 3553(a) strongly weigh against compassionate release.

Even when an inmate has shown "extraordinary and compelling reasons" and demonstrated that he is not dangerous, he is still not entitled to compassionate release. Before ordering relief, the Court must consider the factors set forth in 18 U.S.C. § 3553(a) and determine that release is appropriate. *See United States v. Knight*, No. 15-20283, 2020 WL 3055987, at *3 (E.D. Mich. June 9, 2020) ("The § 3553(a) factors . . . weigh against his request for compassionate release."); *United States v. Austin*, No. 15-20609, 2020 WL 2507622, at *3–*5 (E.D. Mich. May 15, 2020) (holding that the "[d]efendant's circumstances do not warrant compassionate

release . . . under 18 U.S.C. § 3553(a)"); *United States v. Murphy*, No. 15-20411, 2020 WL 2507619, at \*6 (E.D. Mich. May 15, 2020) (denying compassionate release because "the 18 U.S.C. § 3553(a) sentencing factors do not favor release"); *see also United States v. Kincaid*, 802 F. App'x 187, 188–89 (6th Cir. 2020) (upholding a district court's denial of compassionate release based on the § 3553(a) factors). So even if the Court were to find Cramer eligible for compassionate release, the § 3553(a) factors should still disqualify him.

Cramer has served very little of his sentence so far: less than four months of his 18-month sentence. Cramer committed a very serious offense—he conspired to put an immense quantity of methamphetamine into the community. A sentence of four or five months is far less than what is required to reflect the seriousness of Cramer's offense.

Cramer also needs to serve at least 18 months to deter him and others from such criminal conduct in the future. Based on Cramer's criminal history and long-term struggles with drug abuse, it appears that his willingness to engage in the conspiracy stemmed in part from his own drug addiction. But drug treatment and court supervision have not been successful so far in deterring Cramer. Even while on bond in prior to his sentencing, Cramer continued to test positive for marijuana. (PSR at ¶ 47.) He has been on court supervision in the past (PSR at ¶¶ 29 & 30) and has participated in drug treatment programs (PSR at ¶¶ 48-50). Yet, Cramer

17

participated in a conspiracy to distribute over a kilogram of methamphetamine. Only a significant custodial sentence can provide meaningful deterrence to Cramer and others. A four or five-month sentence is woefully insufficient for deterrence.

Defendant's release would also cause an unwarranted sentencing disparity. Cramer got a significant break at his sentencing, and now he seeks another significant sentencing reduction. Cramer could have continued to postpone his requirement to report to prison, but he instead decided to report to the BOP and then a week later he submitted a request to be released. It is not fair or just that defendant only serves a few months for his crime, while most others who commit the same offense under the same circumstances serve far greater sentences.

Early release to home confinement would undermine the purposes of sentencing as set forth in the 3553(a) factors, and therefore the court should deny Cramer's motion.

## III.   If the Court were to grant Cramer's motion, it should order a 14-day quarantine before release.

If the Court were inclined to grant Cramer's motion despite the government's arguments above, the Court should order that he be subjected to a 14-day quarantine before release.

## Conclusion

Cramer's motion should be denied.


Dated: November 18, 2020        MATTHEW SCHNEIDER
United States Attorney


*/s Jules M. DePorre*_____
JULES M. DePORRE (P73999)
Assistant United States Attorney
600 Church Street
Flint, Michigan 48502-1280
Phone: (810) 766-5026
Fax: (810) 766-5427
jules.deporre@usdoj.gov


## CERTIFICATE OF SERVICE

I certify that on November 18, 2020, I filed the foregoing document

using the court's CM/ECF system which will send notice to all registered

parties.

*/s Jules M. DePorre*
Assistant U.S. Attorney